## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ABIGAIL JEAN ULMER, | CASE NO. 1:25-CV-01522-CAB |
| Plaintiff, | JUDGE CHRISTOPHER A. BOYKO |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Abigail Jean (a/k/a Harvey) Ulmer[1] challenges the Commissioner of Social Security's decision denying period of disability and disability insurance benefits (collectively, DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated July 22, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

On October 14, 2022, Harvey applied for DIB, alleging disability beginning July 15, 2022, due to Type I diabetes, attention deficit hyperactivity disorder (ADHD), right leg and muscle pain,

---

[1] Plaintiff filed this case under the above-captioned name though testified at the hearing to going by the name Harvey and using male pronouns. (Tr. 35; *see also* Tr. 577). The ALJ's decision kept the previous name as a caption and used male pronouns. (Tr. 10-29). For consistency, I maintain the case caption as filed, but use the name Harvey throughout.

1

obsessive-compulsive disorder (OCD), anxiety, and high blood pressure. (Tr. 60, 196). After the claims were denied initially and on reconsideration, Harvey requested a hearing before an administrative law judge. (Tr. 80, 92, 99). On June 27, 2024, Harvey (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 32-58). On July 11, 2024, the ALJ determined Harvey was not disabled. (Tr. 13-25). On June 4, 2025, the Appeals Council denied Harvey's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Harvey timely filed this action on July 22, 2025. (ECF #1).

FACTUAL BACKGROUND

## I.      Personal and Vocational Evidence

Harvey was 24 years old on the claimed disability date and 26 years old at the hearing. (*See* Tr. 60, 36). Harvey has a high school diploma, but no past relevant work experience. (*See* Tr. 36, 51-52).

## II.      Relevant Medical Evidence

Harvey had received treatment for depression, anxiety, and ADHD before the alleged onset of disability in July 2022. (*See, e.g.*, Tr. 506, 564). Harvey reported experiencing sadness, social phobia, panic attacks, some paranoia, problems concentrating, and difficulty getting along with others. (*See* Tr. 503, 520, 540). Mental status examinations conducted from August 2021 through June 2022 generally yielded normal findings. (*See, e.g.*, Tr. 503-05, 508-10, 513-15, 529-30, 533-35, 539-40). January and February 2022 were the exception. In January, Harvey demonstrated a slow, soft speech; a depressed mood with a flat, blunted affect; and fair to poor insight. (Tr. 518-19). In February, Harvey demonstrated rapid, pressured speech. (Tr. 523-25). Harvey was prescribed medications that required adjustment. (*See* Tr. 505, 510, 520).

Harvey continued treatment after the June 2022 alleged onset date. Mental status examinations conducted from September 2022 through June 2023 generally continued to yield normal findings. (Tr. 543-45, 548-50, 570-72, 575-77, 1068-70, 1073-75). But in September and November 2022, Harvey reported auditory hallucinations of someone laughing or the television being on. (Tr. 545, 550). Harvey's medications were held steady (though referred to by generic names). (Tr. 545, 550, 572, 577). In May 2023, Harvey reported difficulty concentrating and repeating himself so was prescribed an additional ADHD medication. (Tr. 1070, 1075). Harvey was also in parallel counseling beginning in May 2023 where the counselor noted no significant changes in Harvey's condition. (Tr. 1035, 1038). Also in May 2023, Harvey requested to be assessed for autism and was referred to an evaluator. (Tr. 1036). In a June counselling session, Harvey set a goal of reducing social anxiety after recounting dissatisfaction with coworkers and reporting difficulty in various social interactions such as visiting public places, making phone calls, and talking to people face-to-face. (Tr. 1039).

Harvey reported resigning from work in September 2022. (Tr. 545). Harvey reported making some money working for DoorDash and other jobs. (Tr. 572, 583). In March 2023, Harvey was hired again at a dollar store. (Tr. 577). By June 2023, Harvey reported being terminated from the Dollar Store due to being "rude and nasty to people," which Harvey denied. (Tr. 1073, 1075). The provider recounted Harvey "did not interact well with the coworkers and customers." (Tr. 1075). Harvey reported aspiring to work as an editor and the provider noted an uptick in mood and interest when describing that work. (*Id.*). Harvey also reported to have been cast in online plays and reported enjoying them at the time. (Tr. 1036).

From July 2023 (after the state agency reviewed Harvey's claim on reconsideration) through October 2023, Harvey exhibited in medication management "some paranoid delusions," anxious mood, intense affect, and "somewhat obsessive." (Tr. 1079-80, 1084-85, 1094-95). But the September 2023 appointment noted normal findings. (Tr. 1088-90). Those abnormal findings did not appear after October and mental status examinations from November 2023 through April 2024 yielded normal findings. (*See* Tr. 1098-1100, 1103-05, 1108-10, 1198-1200). During that time, Harvey's medications were adjusted twice. (Tr. 1090, 1200). In parallel counseling from July 2023 to March 2024, the counselor noted no significant changes in Harvey's condition. (Tr. 1041, 1044, 1047, 1050, 1053, 1056, 1059, 1062, 1065). In these sessions Harvey often reported being stressed and anxious, particularly in social situations. (*See* Tr. 1042, 1045, 1048, 1051, 1054). In February 2024, Harvey reported walking off the job after being refused a break to raise his blood-sugar levels. (Tr. 1110). In that same visit, Harvey described wanting to work in the TV industry. (*Id.*). In April 2024, Harvey reported starting editing videos for 10 people. (Tr. 1200).

As a teenager, Harvey was diagnosed with Type 1 diabetes. (Tr. 342). The record contains regular treatment records for diabetes and hyperlipidemia covering December 2020 to October 2023. (*See* Tr. 677-78, 674-75, 671-72, 668-69, 665-66, 456-57, 399-400, 394-95, 372-73, 342-43, 320-23, 601-02, 599-600, 597-98, 806-07, 788-89) (ordered chronologically). Harvey had fatigue, shortness of breath, hand numbness, insomnia, and rolling-ankle falls. (*See* Tr. 320, 597, 788). Harvey was prescribed medication for hyperlipidemia and prescribed Ozempic. (Tr. 602, 599, 597). Harvey generally denied neuropathic discomfort in the legs in regular appointments, but did report some foot and ankle pain and rolling-ankle falls. (*See* Tr. 677, 674, 671, 666, 399, 394, 372, 342, 320, 601; *but see* Tr. 665, 456, 806, 788). But in April 2021, Harvey sought treatment for

4

chronic full-body pain, pain in the knees and feet "for a long while," back pain, and pain in the hands and neck. (Tr. 612, 614). The provider discussed the impact of obesity; stressed diet, exercise, and weight loss; and referred Harvey to a weight-loss clinic. (Tr. 613, 631). Harvey also sought chiropractic treatment for leg pain in December 2022, but it did not yield satisfactory results. (*See* Tr. 644).

### III. Relevant Opinion Evidence

On February 10, 2023, state agency medical consultant Steve McKee, M.D., reviewed Harvey's file and opined Harvey can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand, walk, and sit for about six hours each in an eight-hour workday; can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and can never climb ladders, ropes, or scaffolds. (Tr. 64-65). On May 22, 2023, state agency medical consultant Mehr Siddiqui, M.D., reviewed updated medical evidence and affirmed Dr. McKee's findings. (Tr. 73-74).

On January 4, 2023, state agency psychiatric consultant Janet Souder, Psy.D., reviewed Harvey's file and opined Harvey was moderately limited in (1) maintaining attention and concentration for extended periods, (2) completing a normal workday and workweek without interruptions from psychologically based symptoms, (3) performing at a consistent pace without an unreasonable number and length of rest periods, and (4) responding appropriately to changes in the work setting. (Tr. 65-67). Though Dr. Souder opined Harvey has social-interaction limitations, she found either no evidence of limitation or that Harvey was not significantly limited in social functioning. (Tr. 66). Dr. Souder noted Harvey could "perform simple and routine, 1-2 step tasks, and some multi-step, 3-4 step tasks, that are not fast paced in nature" and "perform in a static work environment that does not require strict production demands." (*Id.*). On June 8, 2023, state

agency psychological consultant Irma Johnston, Psy.D., reviewed updated records and affirmed Dr. Souder's opinion. (Tr. 75-76).

## IV.     Relevant Testimonial Evidence

Harvey described experiencing a number of psychological limitations, including obsessive-compulsive thoughts, ADHD, anxiety, panic attacks, and depression. The obsessive-compulsive disorder causes Harvey to check and re-check everything, such as that appliances are turned off or the dog is in bed. (Tr. 46). This checking process frequently causes Harvey to be late. (Tr. 46).

Harvey is diagnosed with ADHD that causes poor memory and focus. (Tr. 46). Harvey cannot multitask and can focus on tasks for about a few minutes and on video games for at most an hour. (Tr. 46). The ADHD and obsessive-compulsive disorder combine where Harvey may forget if the process of checking everything was complete and must begin the process anew. (*See* Tr. 46).

Harvey has anxiety that causes sudden shaking and nervousness several times a day. (Tr. 48). Some days, Harvey wakes up shaking. (Tr. 48). Harvey also experiences panic attacks. (Tr. 46). Harvey cannot enter stores without someone else to help because stores are too crowded. (Tr. 46-47). Harvey stays home alone most days because no one is available to help. (Tr. 47). The anxiety combines with the panic attacks to keep Harvey feeling that he cannot leave the house. (Tr. 48). At times, Harvey does leave the house to visit a friend, but doing so is difficult. (Tr. 49). When he does leave the house, Harvey does not leave his own town except for doctor's appointments in the next town over. (Tr. 49-50). Harvey avoids driving on the highway or anywhere new if at all possible. (Tr. 49-50). Harvey is paranoid "all the time," typically about the door being unlocked and someone entering the house. (Tr. 47). Harvey also experiences auditory

6

hallucinations including hearing the TV when it is off or hearing different voices in the background. (Tr. 47).

Harvey has depression that leaves him unable to get out of bed about six-to-seven days of the week. (Tr. 47). Harvey alternates between eating too much or not at all. (Tr. 48). Harvey also experiences crying spells, tending to bottle up his emotions; eventually they cause him to burst out crying. (Tr. 47).

Harvey described being physically limited by pain in his leg and diabetes. Harvey has a neuropathic condition in the left leg and foot that causes pain while sitting or standing. (Tr. 42-43). Harvey does not use a cane or walker and was referred to physical therapy but could not pay for therapy. (Tr. 42). Harvey also takes over-the-counter pain relievers and uses ice for relief as needed. (Tr. 43). Harvey was diagnosed with diabetes as a teenager and uses glucose monitors and insulin pumps. (Tr. 43). When blood-sugar levels drop, Harvey gets shaky and weak in the knees. (Tr. 44). Harvey had to quit a job once because the manager refused a break to raise his blood-sugar levels. (Tr. 44).

Harvey is a content creator on YouTube and Twitch with playthroughs of video games. (Tr. 37). Harvey streams twice a day playing Minecraft for an hour at a time at most. (Tr. 37, 42). Harvey must take a break in between streams and so streams in the morning and at 5:00 p.m. (Tr. 42). Harvey estimates earning about $50 every two months from that. (Tr. 37). Harvey also works as a self-taught freelance video editor for the last 10 years, both for others and for his own videos. (*See* Tr. 39-40, 41). Harvey estimates working about eight hours each day editing and earning about $15 to $30 every two weeks. (Tr. 39-40). Harvey previously worked delivering food through DoorDash but stopped because of a lack of orders. (Tr. 39). Harvey also has auditioned

7

several times for online plays and was cast as the lead in one play. (Tr. 49). But he got nervous and overwhelmed by the prospect of being the lead and talking to people and quit. (*See* Tr. 49).

**STANDARD FOR DISABILITY**

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520— to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including

8

inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined that Harvey's work after the claimed disability date of July 15, 2022 did not constitute substantial gainful activity. (Tr. 15-16). At Step Two, the ALJ identified the following as severe impairments: major depressive disorder, generalized anxiety disorder, ADHD, diabetes mellitus, posterior tibial tendonitis, and morbid obesity. (Tr. 16). At Step Three, the ALJ found Harvey's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 16-18).

At Step Four, the ALJ determined Harvey's RFC as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except no climbing ladders, ropes, and scaffolds; occasionally climbing ramps and stairs; and occasionally stooping, kneeling, crouching or crawling. Mentally, the claimant can perform simple tasks not involving a fast production rate such as a fast assembly-line pace. He can adapt to occasional changes at the workplace and can have occasional contact with coworkers and supervisors but no contact with the public. The contact with coworkers and supervisors should not involve negotiation, evaluation, persuasion, conflict resolution, or anything more than the straightforward exchange of information.

(Tr. 18) (cleaned up). The ALJ concluded Harvey had no past relevant work and so proceeded to Step Five. (Tr. 23). At Step Five, the ALJ determined Harvey could perform other work in the national economy, including as a merchandise marker, small-products assembler, and routing clerk. (*See* Tr. 24). Thus, the ALJ concluded Harvey was not disabled. (Tr. 24-25).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

9

correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.,* 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.,* 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial

10

evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

Harvey argues the ALJ erred in three ways, by: (1) misevaluating the prior administrative medical findings, (2) basing the RFC on an insufficient record that lacked a psychological opinion, and (3) misevaluating Harvey's subjective statements of his mental limitations. (ECF #7 at PageID 1264). I address each argument in turn.

## I.  Analysis of the prior administrative findings

First, Harvey argues the ALJ misevaluated the prior administrative findings by rejecting the opined limitation to performing 1-2 step tasks and some 3-4 step tasks and instead finding Harvey limited to simple tasks. (*See* ECF #7 at PageID 1266-68). Harvey argues the prior administrative findings were consistent with the Social Security Administration's Programs Operations Manual System (POMS) and the ALJ's rationale that specific numbers of steps are not useful was inadequate. (*See id.*). The Commissioner responds the ALJ was not required to adopt the opinion verbatim and the POMS does not quantify tasks by number of steps but instead discuses "very

11

short and simple" instructions. (ECF #8 at PageID 1290-92). Harvey clarifies that the issue is not that the POMS requires quantifying steps, but that the ALJ rejected limitations as not usefully worded when the limitations used terminology consistent with the POMS. (ECF #9 at PageID 1305). Harvey also emphasizes multiple district courts in this circuit have also quantified the number of steps in a task in the RFC. (*Id.* at PageID 1304) (collecting cases).

In assessing the claimant's RFC, the ALJ must review all medical opinions and prior administrative findings and explain how persuasive he finds them. *See* 20 C.F.R. § 404.1520c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R § 404.1520c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinion," the two most important factors. *See id.* § 404.1520c(b)(2). *Supportability* is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation" and *consistency* is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017).

The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* The reasons for the

ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability, and substantial evidence supports the discussion, then the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

### A. The ALJ analyzed the supportability of the opinion by criticizing the opined limitation to certain numbers of tasks and provided a sufficient explanation for not adopting that limitation.

The ALJ analyzed the task limitations in the prior administrative findings as follows:

> The state agency reviewed the evidence last on June 9, 2023 and suggested simple routine 1-2 step tasks and some 3-4 step tasks that are not fast paced in nature, and in a static work setting with no strict production demands. I did not adopt a limit on a number of task steps, as nearly any task can be further subdivided into additional steps and, therefore, this is not a useful way to describe task complexity. However, the reduction in job complexity and the need for limits on pace, production and workplace changes are persuasive limits as they are supported by the rationale and consistent with the documented complaints and mental status exam findings . . .

(Tr. 21).

Courts have disagreed on whether a limitation to "1-2 step" tasks is meaningfully distinct from "simple" tasks. *See Raymond G. v. Bisignano*, No. 6:25-cv-16, 2025 WL 3704403, at *6 (E.D. Ky. Dec. 22, 2025) (discussing cases). Regardless of whether the ALJ intended to adopt a different limitation than the opinion or use different words to describe the same limitation, there is no error here.

To start, though the ALJ did not use the word supportability, the analysis of the 1-2 step limitation applies the core reasoning supportability factor. Supportability is "the extent to which a medical source's opinion is supported by . . . the source's supporting explanation." *See Revisions to*

13

*Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. at 5859, 2017 WL 168819. By criticizing the specific quantification of the number of steps, the ALJ interrogates the supporting explanation for the opined mental limitations and applies the supportability factor.

To be sure, if the ALJ had not explained why the RFC omitted the 1-2 step limitation, remand might be appropriate. *See Green v. Comm'r of Soc. Sec.*, No. 3:20-cv-1623, 2022 WL 610643, at *3-4 (N.D. Ohio Mar. 2, 2022). But the ALJ's rationale for why the supporting explanation is deficient is clear: specific numbers of steps are not a useful description of task complexity. Another judge in this district recently faced this issue and affirmed the ALJ limiting the claimant to "simple tasks" over the opined limitation of "1-3 step tasks" and accepted the ALJ's rationale that "nearly any task can be further divided into sub-steps, rendering this an unhelpful way to describe complexity." *See Briggs v. Comm'r of Soc. Sec.*, No. 1:24-cv-947, 2025 WL 1322659, at *20 (N.D. Ohio May 7, 2025), *report and recommendation adopted,* 2025 WL 2673390 (N.D. Ohio Sept. 18, 2025). Thus, the ALJ's decision sufficiently explained why the 1-2 step limitation was not incorporated into the RFC.

> **B.**     **A violation of the POMS guidelines does not warrant remand; even if it did, Harvey has not shown a violation of the POMS guidelines by the ALJ rejecting the opined limitation to certain numbers of steps in a task.**

Harvey argues the ALJ should have accepted the opinion's language because using specific task numbers is consistent with the POMS. (*See* ECF #7 at PageID 1266-67; ECF #9 at PageID 1305). But Harvey does not show how the ALJ's reasoning is faulty.

To start, the POMS "is a policy and procedure manual that employees of the [Social Security Administration] use in evaluating Social Security claims." *Davis v. Sec'y of Health & Hum. Servs.*, 867 F.2d 336, 340 (6th Cir. 1989). "POMS guidelines are not legally binding on the Court and do not bind the Commissioner." *Johnson v. Comm'r of Soc. Sec.*, No. 5:21-cv-1721, 2022 WL

14

2612113, at *16 (N.D. Ohio Apr. 14, 2022) (discussing cases), *report and recommendation adopted,* 2022 WL 2712174 (N.D. Ohio July 13, 2022); *see also Sterle v. Bowen*, No. G87-345 CA5, 1987 WL 123610, at *2 (W.D. Mich. Nov. 19, 1987) (discussing the previous Claims Manual and the legislative history leading up to the POMS); *Tejada v. Apfel*, 167 F.3d 770, 775 (2d Cir. 1999) (holding POMS guidelines "do not bind the Commissioner."); *Davis*, 867 F.2d at 340 ("[I]t does not have the force and effect of law" but "it is nevertheless persuasive."). And "the Agency's failure to follow a POMS procedure does not give rise to a due process violation." *Selyak v. Comm'r of Soc. Sec.*, No. 1:17-cv-1627, 2018 WL 3244618, at *11 (N.D. Ohio May 22, 2018) (quoting *Ball v. Colvin*, No. CV-2012-1574, 2013 WL 5886604, at *7 (D. Ariz. Oct. 31, 2013)), *report and recommendation adopted,* 2018 WL 3241241 (N.D. Ohio July 3, 2018).

But even taking the POMS for its persuasive value, Harvey has not established the POMS guidance was violated. The POMS describes "the mental demands of unskilled work" as including the abilities to "[u]nderstand, carry out, and remember simple instructions" and "[m]ake judgments that are commensurate with the functions of unskilled work (*i.e.*, simple work-related decisions)." POMS DI 25020.010(A)(3)(a), Mental Limitations, https://secure.ssa.gov/poms.nsf/lnx/0425020010 (last accessed May 19, 2026). Harvey has not shown the ALJ's limitation in the RFC to "simple tasks not involving a fast production rate such as a fast assembly-line pace" contradicts the POMS. (Tr. 18). Indeed, the RFC uses the same word "simple" that appears in the POMS. And Harvey concedes "the POMS section does not provide terms as number of steps." (ECF #7 at PageID 1266). Thus, the ALJ's language is closer to the section of the POMS than the opinion's use of specific numbers of steps.

15

Instead, Harvey argues "[t]he issue is not whether the ALJ was required to adopt the individual limitations preceding the narrative portion of [prior administrative medical findings, a/k/a PAMFs] but whether the ALJ was permitted to diverge from the limitations contained in the PAMFs when the PAMFs were provided in Agency-compliant terminology." (ECF #9 at PageID 1305). Harvey also asserts it "was useful and reasonable for the PAMFs to specify "very short" instructions as limiting Plaintiff to 1-2 or 3-4 step tasks." (*See* ECF #7 at PageID 1266-67). But Harvey cites no authority that an ALJ must follow an opinion when that opinion is provided in agency-compliant terminology. To the contrary, the Sixth Circuit has held even if an ALJ gives an opinion "great weight," the ALJ is not required to adopt the opinion's limitations "verbatim" or "wholesale." *Reeves*, 618 F.App'x at 275. Thus, the ALJ would be free to diverge from the prior administrative findings to abandon a specific quantity of steps and instead use the "simple" terminology used in the POMS. And whether a claimant believes a description is useful and reasonable does not mean the ALJ must use that description. Thus, Harvey has not shown the ALJ deviated from the POMS.

> **C.** **The ALJ was not required to incorporate the findings of moderate limitations in concentrating, persisting, and maintaining pace because those findings were not part of the state agency psychological consultants' narrative RFC findings.**

Harvey separately argues the ALJ erred by finding as persuasive the moderate limitations on concentrating, persisting, and maintaining pace in the prior administrative findings, but omitting them from RFC without explanation. (ECF #7 at PageID 1267-68). Harvey cites to POMS DI 25020.010(B)(2)(a) to argue those limitations are "[a]ligned with the Commissioner's own policy" and the ALJ must give a reason to exclude those limitations. (ECF #7 at PageID 1267). The Commissioner responds the ALJ was not required to evaluate those findings and instead was

16

tasked with evaluating the narrative component of the opinions, which the ALJ did. (ECF #8 at PageID 1292).

Harvey relies on the ratings by the state agency psychological consultants in tables addressing specific abilities related to sustaining concentration and persistence. (*See* Tr. 66, 75). True, those ratings conform to the language in POMS DI 25020.010(B)(2)(a). *See* http://secure.ssa.gov/poms.nsf/lnx/0425020010 (last accessed May 19, 2026). But, again, the POMS "does not have the force and effect of law" though "it is nevertheless persuasive." *Davis*, 867 F.2d at 340. The POMS holds little persuasive value that the ALJ should incorporate those limitations into the RFC because, as the Commissioner points out, the POMS expressly disclaims that those findings are used by adjudicators in issuing a mental RFC (MRFC):

> **NOTE:** The purpose of the list of specific mental abilities before the narrative explanation sections on the SSA-4734-F4-SUP (MRFC) is to ensure that the [Psychological Consultant (PC)] has considered each of the pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis. **It is the narrative** written by the PC **that adjudicators use as the assessment of MRFC**. Adjudicators must take the MRFC assessment and decide what significance the elements discussed in this MRFC assessment have in terms of the person's ability to meet the mental demands of past work or adjust to other work. This must be done carefully using the adjudicator's informed professional judgment.

POMS DI 25020.010(B)(1), Mental Limitations, http://secure.ssa.gov/poms.nsf/lnx/0425020010 (last accessed May 19, 2026) (emphasis in original). And elsewhere, the POMS describes that section of Form SSA-4734-F4-SUP as "summary conclusions" that are "**merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**." POMS DI 24510.060(B)(2), Mental Residual Functional Capacity Assessment, http://secure.ssa.gov/poms.nsf/lnx/0424510060 (last accessed May 19, 2026) (emphasis in original). The opinion form in the administrative record contains a

similar disclaimer: "The questions below help determine the individual's ability to perform sustained work activities. *However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s)*, which describes how the evidence supports each conclusion." (Tr. 65, 74) (emphasis added). Courts have thus rejected arguments that an ALJ must incorporate into the RFC the findings in the summary conclusions or explain why they were omitted. *See Griffith v. Comm'r of Soc. Sec.*, 582 F.App'x 555, 563 (6th Cir. 2014); *Velez v. Comm'r of Soc. Sec.*, No. 1:09-cv-715, 2010 WL 1487599, at *6 (N.D. Ohio Mar. 26, 2010) (citing cases).

> **D.** **Any error at Step Five from a potential conflict between the RFC and the definitions of some, but not all, of the jobs cited at Step Five would be harmless.**

Last, in a footnote, Harvey argues the limitations in the RFC to "simple tasks not involving a fast production rate such as a fast assembly line pace" is inconsistent with the representative occupations cited at Step Five of routing clerk and small-products assembler because a routing clerk may involve a conveyor belt and a small-parts assembler works in an assembly line and thus at a fast, assembly-line pace. (ECF #7 at PageID 1268 at n.1). A footnote is a disfavored means to raise an argument. *See Henkel of Am., Inc. v. Bell*, 825 F.App'x 243, 260 (6th Cir. 2020). Moreover, it is improper to present disparate challenges to different steps of the sequential analysis within the same issue. *See Elledge v. Comm'r of Soc. Sec.*, No. 1:23-cv-1979, 2024 WL 3237455, at *6 (N.D. Ohio Apr. 9, 2024), *report and recommendation adopted*, 2024 WL 3228390 (N.D. Ohio June 28, 2024). Nevertheless, and for the sake of completeness, I will address the argument.

Social Security Ruling (SSR) 00-4p instructs an ALJ to "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the *Dictionary of Occupational Titles*" (DOT). SSR 00-4P, 2000 WL 1898704, at *1 (Dec. 4, 2000). Neither the DOT nor the VE's testimony automatically trumps the other when

there is a conflict between the two. *Id.* at *2. The ALJ must resolve the conflict by determining if the explanation given is reasonable and provides a basis for agreeing with the expert over the DOT. *Id.* In the Sixth Circuit, the ALJ satisfies the duty under SSR 00-4p to identify conflicts by asking the VE whether the testimony provided was consistent with the DOT. *Martin v. Comm'r of Soc. Sec.*, 170 F.App'x 369, 374 (6th Cir. 2006). SSR 00-4p does not address what to do when a conflict is not apparent. *Id.*

The ALJ posed to the VE a hypothetical individual with Harvey's RFC, complete with the limitation to "simple tasks not involving a fast production rate such as a fast assembly line pace." (Tr. 52; *see also* Tr. 18). The VE testified such a person could work as a small-parts assembler and routing clerk. (Tr. 52-53). The VE also testified the answers given were consistent with the DOT. (Tr. 57). Harvey's counsel had an opportunity to cross-examine the VE but declined. (Tr. 56). At no point did anyone raise a potential conflict between the person not working at a fast assembly line pace and the DOT potentially designating a routing clerk "according to work station as conveyor belt package sorter" or the DOT defining a small-products assembler as one who "frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker." *See Routing Clerk, Dictionary of Occupational Titles* (4th ed., 1991), 222.687-022, 1991 WL 672133; *Assembler, Small Products I, Dictionary of Occupational Titles* (4th ed., 1991), 706.684-022, 1991 WL 679050. With no mention of a potential conflict and the VE's statement that the testimony was consistent with the DOT, there was no requirement for "the ALJ to conduct an independent investigation into the testimony of [the VE] to determine if [the VE is] correct." *Martin*, 170 F.App'x at 374 (noting that it was the claimant's burden, through counsel, to present to the ALJ any argument that the VE's testimony was inconsistent with the DOT).

Even presuming Harvey could not have worked as a routing clerk or assembler, any error would be harmless. The ALJ also found Harvey could work as a marker and there is no similar problem with that job. *See Marker, Dictionary of Occupational Titles* (4th ed., 1991), 209.587-034, 1991 WL 671802. The presence of an unresolved conflict between a VE and the DOT regarding some, but not all, the jobs cited by the ALJ does not warrant remand. *See Martin*, 170 F.App'x at 374-75 (finding no error at Step Five even after excluding two of three cited jobs because there were significant numbers of the third job in the national economy). Thus, because Harvey has not shown a conflict with the marker job, any error at Step Five would be harmless.

For the reasons I have outlined, I decline to recommend remand on any of these bases.

**II.    *Deskin* claim**

Harvey argues the ALJ erred by interpreting hearing-level evidence into greater functional limitations than the prior administrative findings found instead of ordering a consultative examination that could review the entire record. (ECF #7 at PageID 1269). Harvey relies on *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908 (N.D. Ohio 2008), and its progeny. (*See* ECF #8 at PageID 494-95).

The *Deskin* rule states:

> . . . [when] the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated non-examining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases [in which] the medical evidence shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity.

605 F.Supp.2d at 912 (cleaned up).

The *Deskin* Court later clarified the rule is not a bright-line test and "potentially applies only when (1) an ALJ makes a finding of work-related limitations based on no medical source opinion or (2) an outdated source opinion that does not include consideration of a critical body of objective medical evidence." *Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-25, 2011 WL 5024866, at *2 (N.D. Ohio Oct. 21, 2011). Harvey asserts the case falls under both situations: "the ALJ made an RFC determination based upon no medical source opinion, and the ALJ made an RFC determination based on an outdated source opinion that did not include consideration of a critical body of objective medical evidence." (*See* ECF #7 at PageID 1271).

Setting aside whether an ALJ can base an RFC on no opinion and an outdated opinion simultaneously, Harvey's reliance on *Deskin* is dubious. The Sixth Circuit has not squarely addressed *Deskin* or its progeny and the decision has received considerable negative treatment from other courts in this district. *See, e.g.*, *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010); *Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-1793, 2023 WL 7622634, at *4 (N.D. Ohio Nov. 15, 2023) ("*Deskin* is a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law."); *Kopis v. Kijakazi*, No. 1:22-cv-2212, 2024 WL 1131058, at *2 (N.D. Ohio Mar. 15, 2024) ("[A]n ALJ's finding that runs afoul of the *Deskin* decision's rationale is not a basis for remand."). Thus, the Court could reject Harvey's argument to the extent it is based on *Deskin* and its progeny.

Equally important, however, the Sixth Circuit has rejected the logic underpinning Harvey's argument. Harvey contends that "the findings are unsupported by substantial evidence" because "the record does not contain another opinion stating the findings that were then adopted by the ALJ" and "the record does not contain a new medical source considering the critical body of

21

evidence now identified by the ALJ as supporting different findings than indicated in the PAMFs." (ECF #7 at PageID 1272). To Harvey, the ALJ cannot independently analyze hearing-level evidence unless filtered through a medical-source opinion. But in *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F.App'x 395, 401 (6th Cir. 2018), the Sixth Circuit, in an unpublished decision, rejected the argument "that once the ALJ decided to give no weight to the physicians' opinions regarding his ability to work, the ALJ was required to get the opinion of another physician before setting the" RFC. *Id.* The Court did not address *Deskin* directly, but instead applied its cases holding an ALJ does not have to base the RFC on a medical-source opinion. *See id.* (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F.App'x 435, 442-43 (6th Cir. 2017) (rejecting the argument that "the ALJ's [residual functional capacity] lacks substantial evidence because no physician opined that [the claimant] was capable of light work")); *see also Tucker v. Comm'r of Soc. Sec.*, 775 F.App'x 220, 226 (6th Cir. 2019) (holding there is "[n]o bright-line rule" stating that "medical opinions must be the building blocks of the" RFC). Thus, the Court could also reject Harvey's argument that the ALJ cannot assess "hearing-level evidence" of greater limitations without first seeking a medical opinion functionally requiring the ALJ to base the RFC as contrary to Sixth Circuit caselaw.

Even if the Court accepted *Deskin* for its persuasive value, remand is not appropriate here because the hearing-level evidence did not require a new medical opinion. Whether the evidence submitted after the medical opinions constitutes a "critical body of objective medical evidence," *see Kizys*, 2011 WL 5024866, at *2, depends on multiple factors, including the length of the treatment period omitted, whether the later-submitted records contain novel or different symptoms or diagnoses than records reviewed by the medical sources, and whether the later-submitted records would likely change the RFC. *See Law v. Comm'r of Soc. Sec.*, No. 1:22-cv-900, 2023 WL 2787941,

22

at *8 (N.D. Ohio Apr. 5, 2023). The Court must "determine whether it was the type of medical evidence that required a medical opinion" to enable the ALJ to make the disability decision. *Stevenson v. Kijakazi*, No. 5:20-cv-2688, 2022 WL 4551590, at *15 (N.D. Ohio Sept. 29, 2022).

Harvey contends the ALJ needed a new opinion to analyze the evidence on which the ALJ based the social limitations. (*See* ECF #7 at PageID 1271). The ALJ rejected the social limitations in the prior administrative findings because:

> It is obvious that the state agency did not include any social interaction limitations in the assessments but hearing level evidence contains documentation of deficits in the claimant's ability to interact with others in the workplace. Demonstration of such issues can be seen [*sic*] the reports about the claimant's rudeness and firing, his walking off the job at Dollar Store, albeit with the claimant needing to address low blood sugar and being denied, and his reports of struggling with social anxiety in counseling records. Thus, the lack of such limitations in the DDS assessments is less persuasive as the evidence in the record does support them and they are consistent with the claimant working on social anxiety issues.

(Tr. 21). Reports about Harvey being fired for rudeness, Harvey's testimony about walking off the job after being denied a break to address low blood-sugar levels, and counseling records showing an ongoing struggle with social anxiety are not a critical body of objective evidence that must be interpreted through a new opinion.

To start, Harvey also cites a number of records from *before* the last state agency review in June 2023. (*See* ECF #7 at PageID 1272-73). Some records, including reports of racing thoughts and an ADHD diagnosis, were included in state agency review. (*See* ECF #7 at PageID 1273 ("Dr. Bentley noted, "[Harvey] definitely has every mark for ADHD.") (citing Tr. 1070); *but see* Tr. 69 (listing ADHD as an impairment), 71 (listing as evidence April 2020 counseling report finding social phobia, racing thoughts, and panic attacks)). This evidence was thus not omitted from the state agency review and was interpreted through an opinion.

Much of the record evidence after state agency review that Harvey points to consists of mental status examinations and counseling treatment notes. These types of records, even when noting an anxious or depressed mood with normal affect, thought process, thought content and good memory, attention, and judgment "are not overly complex such that a lay person could not make a commonsense judgment about functional capacity" without a medical-source opinion. *See Bird v. Comm'r of Soc. Sec.,* No. 1:20-cv-11919, 2021 WL 8014027, at *4 (E.D. Mich. Nov. 30, 2021), *report and recommendation adopted,* 2022 WL 851718 (E.D. Mich. Mar. 22, 2022).

Also, part of the hearing-level evidence is the claimant's own testimony. The ALJ can analyze a claimant's testimony in the hearing without offending *Deskin.* The judge from *Deskin* later upheld an RFC based on a "claimant's own testimony and behavior" showing the functional effects of carpal tunnel syndrome were less severe than claimed. *See Harris v. Comm'r of Soc. Sec.,* No. 1:14-cv-1213, 2015 WL 4984940, at *2 (N.D. Ohio Aug. 19, 2015). Thus, the ALJ can review Harvey's testimony and daily activities in crafting the RFC without running afoul of *Deskin.*

Turning to the length of time after state agency review, just over a year passed between the last state agency review on June 8, 2023 and the administrative hearing on June 27, 2024. (*See* Tr. 76, 30). This is less time than the multi-year gaps in other cases requiring a medical opinion. *See, e.g., Deskin,* 605 F.Supp.2d at 910 (two years); *Fergus v. Comm'r of Soc. Sec.,* No. 5:20-cv-2612, 2022 WL 743487, at *11 (N.D. Ohio Mar. 11, 2022) (four years). But it is just longer than gaps where courts have found no opinion is required. *See Jackson v. Comm'r of Soc. Sec.,* No. 4:13-cv-929, 2014 WL 2442211, at *8 (N.D. Ohio May 30, 2014) ("less than one year" of records); *Raber v. Comm'r of Soc. Sec.,* No. 4:12-cv-97, 2013 WL 1284312, at *17 (N.D. Ohio Mar. 27, 2013) ("roughly eleven months").

24

Next, the treatment records from after the state agency review on June 8, 2023 do not contain novel or different symptoms or diagnoses than records pre-dating that review. Harvey's mental health diagnoses remained consistent, with notations that they were "maintaining," not "worsening" or "deteriorating." (*See* Tr. 1068, 1073, 1078, 1083, 1093, 1098, 1103, 1108, 1198). The only exceptions were findings from July 2023 to October 2023 noting "some paranoid delusions," anxious mood, intense affect, and "somewhat obsessive" thoughts. (*See* Tr. 1079-80, 1084-85, 1094-95). Harvey began counseling in May 2023, close in time to the last state agency review, and Harvey's counselor consistently noted "no significant change from last visit" in Harvey's condition throughout the period until the administrative hearing. (*See* Tr. 1038, 1041, 1044, 1047, 1050, 1053, 1056, 1059, 1062, 1065). And, over that period, Harvey consistently reported being stressed and anxious, particularly in social situations. (*See* Tr. 1039, 1042, 1045, 1048, 1051, 1054). Thus, the treatment records report consistent mental health diagnoses and conditions since the state agency review and do not show novel or different symptoms or diagnoses that might require expert psychological assessment.

Thus, the evidence from after state agency review does not constitute a critical body of evidence that was missing and must be interpreted through an expert opinion. The evidence covers a single year, does not contain novel or different symptoms or diagnoses, consistently indicates a stable mental health condition, and is not so complex that the ALJ could not interpret it without assistance.

I thus decline to recommend remand on this basis.

### III.   SSR 16-3p

Third, Harvey argues the ALJ misevaluated Harvey's testimony because the ALJ did not identify specific inconsistent statements, did not discuss most mental-status examinations, did not

contextualize the work history, and overly focused on daily activities and desire to work in television industry. (ECF #7 at PageID 1274-80). The Commissioner responds that substantial evidence supports the ALJ as the ALJ assessed Harvey's statements using the regulatory factors, including the objective evidence, treatment modality, and daily activities. (ECF #8 at PageID 1296-99).

> ### A. The ALJ's mistaken discussion of a January 2024 treatment note is not dispositive by itself; the analysis overall must lack substantial evidence to support remand.

Harvey first argues the ALJ cited the wrong pages of the record when discussing a January 2024 treatment note. (ECF #7 at PageID 1276). The Commissioner responds this was a harmless error and correctly points out the findings missing from the January 2024 note are all contained in a June 2023 note. (ECF #8 at PageID 1298) (citing Tr. 1073-75).

The ALJ found in relevant part:

> The claimant did complain of making little progress toward his goals of reducing social anxiety at his January 26, 2024 counseling session (Exhibit 12F/29). He complained of losing his job due to being rude to co-workers at the Dollar store. He admitted to not interacting well with other workers or customers. The claimant was on time again with normal findings as to demeanor, engagement, speech, thought processes/content, attention/concentration, perceptions, mood, affect, behavior, associations, insight and judgment. The claimant admitted to missing the second stimulant dose (Exhibit 12F/29-31).

(Tr. 20) (citing Tr. 1063-65). True, page 29 of Exhibit 12F states: "Client further reported thinking he has made little to no progress toward his goal of reducing social anxiety." (*See* Tr. 1063). But pages 29 through 31 of Exhibit 12F do not indicate if Harvey lost a job, was rude, was unable to properly interact with coworkers or customers, or was on time to the session. (*See* Tr. 1063-65). Those pages also do not contain any mental status examination findings nor comment on whether Harvey missed any medication doses. (*See id.*).

26

The ALJ's discussion of the wrong treatment note by itself is not dispositive. The Sixth Circuit has held "harmless error analysis applies to credibility determinations in the social security disability context." *Ulman v. Commr of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Even if the ALJ errs in a factual finding when analyzing a claimant's statements, "[a]s long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess." *Id.* Thus, any error here does not decide the issue. The court must analyze whether substantial evidence supports the overall analysis of Harvey's testimony.

### B.      Substantial evidence supports the ALJ's analysis of Harvey's testimony.

Harvey argues the ALJ misevaluated Harvey's testimony because the ALJ did not discuss most mental-status examinations, did not contextualize the work history, and overly focused on daily activities and desire to work in the television industry. (ECF #7 at PageID 1274-80). The Commissioner responds that substantial evidence supports the ALJ's decision as the ALJ assessed Harvey's statements using the regulatory factors, including the objective evidence, the prescribed treatment modality, and daily activities. (ECF #8 at PageID 1296-99).

In evaluating the claimant's subjective reports of symptoms, Social Security Ruling (SSR) 16-3p provides that an ALJ must consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. 2017 WL 5180304, at *5-8 (Oct. 25, 2017). The ALJ also uses the factors outlined in 20 C.F.R. § 404.1529(c)(3) to evaluate the claimant's statements:

1.      A claimant's daily activities;

2.      The location, duration, frequency, and intensity of pain or other symptoms;

3.      Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors but should provide enough assessment to assure a reviewing court that the ALJ considered all relevant evidence and permit the court to "trace the path" of the ALJ's reasoning. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

The ALJ analyzed Harvey's statements as follows:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent with the claimant's reports to providers, his objective findings on physical and mental exam, his treatment history and his activities of daily living including some work activity. On February 8, 2024, the claimant reported wanting a job in the television industry and by April 4, 2024, the claimant reported that he has a job editing for ten people. The claimant's hearing testimony is not entirely consistent with his actual reports to his counselor. At the hearing, the claimant did not mention his editing jobs for ten clients. There appears to be some discrepancy within his testimony as the claimant appeared to testify as to eight-hour workdays but upon questioning by counsel, he then claimed to spend an hour streaming in the morning followed by an all day break and another streaming session in the evening for about two hours total.

Overall, the allegations are only partially consistent, with the records showing the claimant having friends, leaving his home and driving on the highway, playing computer games, "making" games, and planning for future careers. There is a recent report from Community Counseling that the claimant got the "lead" in an online play and had received other parts in online plays. The claimant said that he did not

28

follow through with any of them, but the fact remains that he did audition. In the record the claimant was documented as reporting that he "is now in 3-4 plays and has been enjoying the experience" which sounds like he did follow through with these auditions and joined the plays. While he testified as to not leaving his house, he told his counselor that he had recently driven to his friend's house using a highway. He was able to overcome his stress and anxiety about this travel. He reported making new friends. His activities of daily living as reflected in the record and in his testimony tend to partially refute many of the allegations.

The claimant has been in regular treatment with medications and counseling. He complained that his mind runs so fast and he struggles with concentration. He was on time, casually dressed, and open and engaging in the interview. He had normal speech, thought processes, attention, concentration, judgment and perceptions. His mood was euthymic and affect reactive. Behavior was cooperative and associations normal. There were no reports of hallucinations. The claimant did complain of making little progress toward his goals of reducing social anxiety at his January 26, 2024 counseling session. He complained of losing his job due to being rude to co-workers at the Dollar store. He admitted to not interacting well with other workers or customers. The claimant was on time again with normal findings as to demeanor, engagement, speech, thought processes/content, attention/concentration, perceptions, mood, affect, behavior, associations, insight and judgment. The claimant admitted to missing the second stimulant dose.

Very notably, the claimant told his counselor that he wants disability but has been denied. However, the claimant also told his counselor that he would like to make money being an editor and showed the counselor a list of talents and things he had done. The counselor wrote that the claimant was "so happy and interested in what [he] was saying that [he] really should work in that field and work [his] way up. [His] life would be much better doing creative things." Thus, the claimant was seeking disability claiming an inability to work any job while simultaneously planning a new career. These reports run counter to the claimant's reports of debilitating symptoms and an ability to concentrate focus for a few minutes to no more than one hour at a time.

The claimant returns to Dollar Store, evidenced by his new hire date in September 2023, but then walks out on a new manager who would not let him take care of his blood sugar. The claimant reported a desire to work in the television industry. Mental status exam findings were intact again. There are abnormal findings at times but more often the findings are intact. He did have an intense affect and anxious mood at one visit. The claimant did have compliance issues. For example, on December 14, 2023, the claimant reported that medications are working but admitted to occasionally forgetting to take them. Mental status exam findings were intact. The record fails to support the extent of symptoms and limitations alleged by the claimant in disability reports or testimony.

29

(Tr. 19-21). This discussion makes evident that in assessing Harvey's testimony, the ALJ considered multiple factors outlined in SSR 16-3p and 20 C.F.R. § 404.1529(c)(3). As discussed above, the ALJ was mistaken in discussing a January 2024 treatment note. But the overall discussion is supported by substantial evidence.

First, as per SSR 16-3p and 20 C.F.R. § 404.1529(c)(3)(i), the ALJ extensively discusses Harvey's daily activities. Harvey takes issue with the ALJ's finding that "While he testified as to not leaving his house, he told his counselor that he had recently driven to his friend's house using a highway. He was able to overcome his stress and anxiety about this travel[.]" (Tr. 20) (citing Tr. 1042). Harvey counters that "[t]he ALJ failed to explain how the ability to drive to a friend's house once on the highway contradicts the other evidence in the record" including treatment notes that work caused significant distress. (*See* ECF #7 at PageID 1278). But the ALJ did not find Harvey's ability to drive to a friend's house contradicted the other evidence in the record. The ALJ found that fact inconsistent with Harvey having "testified as to not leaving his house." (Tr. 20). And the ALJ qualified that conclusion by ultimately finding Harvey's activities merely "tend to partially refute many of the allegations." (*Id.*).

Substantial evidence supports the ALJ's application of the factor. In the cited treatment note, the counselor noted Harvey "reported being stressed and anxious though was able to overcome the distress and accomplish his goals." (Tr. 1042). Harvey correctly points out that note also documented Harvey "further reported recently leaving his job which was reportedly causing significant distress for [him]." (ECF #7 at PageID 1278) (citing Tr. 1042). But that note continues that Harvey "though was able to identify other goals he has set for his vocational fulfillment." (Tr. 1042). The ALJ also discussed later notes documenting Harvey's desire to work in video

editing. (Tr. 20) (quoting Tr. 1075). And the ALJ discussed in the paragraph above that Harvey "reported that he has a job editing for ten people." (Tr. 19-20) (citing Tr. 1198). While the ALJ again cited the wrong page the treatment note, the last page of that note does state Harvey "has a new job editing for 10 people." (Tr. 1200). While Harvey correctly points out editing videos from home and streaming video games online are not the same as full-time competitive employment, the RFC is "the most [a claimant] can still do despite [the claimant's] limitations, *see* 20 C.F.R. § 404.1545(a)(1), so Harvey's ability to do some work despite the limitations imposed by stress and anxiety is relevant to that assessment.

Next, the ALJ discussed the factors that precipitate and aggravate his symptoms, another factor of the analysis under 20 C.F.R. § 404.1529(c)(3)(iii). The ALJ discussed Harvey's social anxiety, noting Harvey auditioned for online plays (though Harvey turned down a lead role); the ALJ also cited a treatment note reporting Harvey was "now in 3-4 plays and has been enjoying the experience." (Tr. 20) (quoting Tr. 1036). As mentioned above, the ALJ also discussed Harvey's anxiety about leaving the house, finding "[w]hile he testified as to not leaving his house, he told his counselor that he had recently driven to his friend's house using a highway. He was able to overcome his stress and anxiety about this travel." (Tr. 20). The ALJ found two potential aggravators of Harvey's anxiety (public performance and travel) and then cited substantial evidence show the resulting symptoms were not as severe as claimed.

Additionally, the ALJ discussed Harvey's medication and non-medication treatment for his symptoms, two related factors under 20 C.F.R. §§ 404.1529(c)(3)(iv) and (v). The ALJ found Harvey "has been in regular treatment with medications and counseling" for mental health. (Tr. 20). The ALJ also found Harvey had some issue with medication compliance, noting "on

31

December 14, 2023, claimant reported that medications are working but admitted to occasionally forgetting to take them." (Tr. 21; *see* Tr. 1103). Substantial evidence supports these findings as the record shows medication management and counseling treatment and does not contain any reports of psychiatric hospitalization. Harvey was prescribed medications that required adjustment. (*See* Tr. 505, 510, 520, 1090, 1200 (each adjusting medications); Tr. 545, 550, 572, 577 (each holding medications steady, though referring to them by generic names); Tr. 1070, 1075 (prescribing an additional ADHD medication). In December 2023, Harvey "report[ed] feels like meds are working but [he] occasionally forgets to take them." (Tr. 1103).

Separate from the regulatory factors, Harvey argues "[t]he record is consistent with Plaintiff's allegations" and cites treatment notes from 2022 and 2023. (ECF #7 at PageID 1280). Harvey additionally argues the ALJ cherry-picked the record in analyzing Harvey's subjective statements. (ECF #9 at PageID 1309-11). True, "[t]he ALJ may not "cherry-pick[] select portions of the medical record to discredit [the claimant's] complaints" of symptoms. *Minor v. Comm'r of Soc. Sec.*, 513 F.App'x 417, 435 (6th Cir. 2013). But arguments that an ALJ cherry-picked record evidence are "seldom successful because crediting [them] would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Additionally, an ALJ's findings regarding an individual's symptoms receive "special deference." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017) (citing *Walters*, 127 F.3d at 531). "As long as the ALJ cited substantial, legitimate evidence to support [the] factual conclusions, [the Court is] not to second-guess." *Ulman*, 693 F.3d at 714.

The ALJ's decision here does not show cherry-picking. Harvey claims the ALJ ignored a treatment note finding Harvey "definitely has every mark for ADHD" and could not concentrate

on or finish tasks. (ECF #7 at PageID 1280) (quoting Tr. 1070). But the ALJ did not overlook how Harvey's ADHD affected his memory and focus; rather, the ALJ discounted those statements as inconsistent with Harvey's daily activities:

> He alleged problems with his memory and said that multitasking is impossible. He said that he can only really focus on one thing at a time and only for a few minutes. The claimant's representative asked the claimant how he can play videogames if he can only focus for an hour. The claimant changed his answer to only an hour rather than only a few minutes. The claimant spends a lot of time playing complicated videogames where he works with others to survive, streams himself playing live for at least two hours a day, and has ten clients with editing jobs.

(Tr. 19). Harvey also contends the ALJ failed to account for Harvey's frequent tardiness due to an obsessive-compulsive need to check and recheck everything. (ECF #7 at PageID 1279). But the ALJ addressed this evidence and found it inconsistent with the record: "As for mental symptoms, the claimant testified that his obsessive-compulsive disorder makes him late to everything as he must check things . . . The claimant is on time to his counseling sessions despite claims that he is always late." (Tr. 19). Substantial evidence supports this finding because Harvey was consistently marked "on time" to appointments. (*See* Tr. 505, 510, 515, 520, 525, 530, 540, 545, 550, 572, 577, 1070, 1075, 1080, 1085, 1095, 1105, 1110, 1200 (each "client arrives on time"); *but see* Tr. 1100 ("client arrives")).

Harvey's best argument for cherry-picking is the contention "auditory hallucinations were documented in the record." (ECF #7 at PageID 1280) (citing Tr. 549, 562). Here, the ALJ found "there were no reports of hallucinations." (Tr. 20) (citing Tr. 1067-70). But Harvey did report auditory hallucinations in September and November 2022 that someone was laughing or the television was on, similar to his testimony. (Tr. 545, 549, 550, 562; *compare* Tr. 47). But Harvey did not make similar reports either before or after. (*See* Tr. 504, 509, 514, 519, 524, 529, 534, 539 (perception within normal limits before September 2022); Tr. 571, 576, 1069, 1074 (same after

November 2022). Thus, while the ALJ's finding may not be perfectly accurate, it describes the overall record and the defect is not enough to show cherry-picking, particularly given the "special deference" to findings made while analyzing a claimant's statements. *See Biestek*, 880 F.3d at 788. Moreover, had the ALJ focused on the two reports instead of the overall trend of normal perception, that could itself be described as cherry-picking. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 285 (6th Cir. 2009) (noting a cherry-picking argument "cuts both ways").

I thus decline to recommend remand on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying period of disability and disability insurance benefits.

Dated: May 19, 2026

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

35